**James Heye LAMBERTUS and Patricia Joyce Lambertus, Respondents,**

**v.**

**Nicholas C. SANTINO, Appellant.**

**No. WD 31405.**

Missouri Court of Appeals, Western District.

Nov. 3, 1980.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 2, 1980.

Application to Transfer Denied Jan. 13, 1981.

William J. Davis and Michael D. Clayman, Kansas City (Davis & Clayman, Kansas City, of counsel), for appellant.

William D. Adkins, Liberty (law firm of William D. Adkins, Liberty, of counsel), for respondents.

Before PRITCHARD, P. J., SWOFFORD, J., and HOUSER, Senior Judge.

NORWIN D. HOUSER, Senior Judge.

Nicholas C. Santino appeals from an order of the Circuit Court of Clay County terminating the parental rights of appellant, the natural father of 14–year old Eric Nicholas Santino and decreeing the adoption of Eric pursuant to § 453.040, RSMo 1969, on the joint petition of the boy's stepfather, James H. Lambertus, and his natural mother, Patricia Joyce Lambertus.

Nicholas and Patricia were married in May 1964 in California. Eric was born of the marriage in August 1966. The parents were divorced in California in August 1968. Custody of Eric was awarded to Patricia. Appellant was given the right to visit Eric twice a week for not more than three hours at a time. Appellant was ordered to pay Patricia $100 per month child support. Patricia married James H. Lambertus in July 1969. Eric continued to live in the Lambertus home from then until the present. Two children were born of the marriage of James and Patricia. Mr. Lambertus worked in California for Ford Motor Company for several years. Lately he was transferred to the Ford plant in Clay County, Missouri. In February 1978 the family left California, moved to Missouri, and established themselves at this address: Box 142R, Kearney, Clay County, Missouri. This petition for adoption was filed by James and Patricia June 7, 1979.

■ Appellant, opposed to the adoption, did not give his written consent. When a person sought to be adopted is under the age of 21 years the written consent of the parents to the adoption is required, § 453.-030, RSMo 1969, except that such consent is not required of a parent who for a period of at least one year immediately prior to the filing of the petition for adoption willfully neglects to provide the child with proper care and maintenance. § 453.040, RSMo 1969.

Following a hearing the trial court made 23 separate findings of fact, including a finding that "for one year or more immediately prior to the filing of the petition herein, the said natural father of the said minor child has willfully, intentionally, substantially and continuously neglected said minor child, and has intentionally and without good cause, failed to provide support as required by the Superior Court of Orange County, California, Case No. D–10013, for the minor child, Eric Nicholas Santino, for at least one (1) year preceding the filing of the Petition for Adoption by the petitioners." The court terminated the parental

rights of appellant and approved the adoption of Eric by petitioners.

Appellant's first point is that the court erred in its ruling that there was intentional and willful neglect on appellant's part for a period of one year. Appellant's second point is that respondents failed to prove that the best interests of the child would be served by severing appellant's parental rights and decreeing the adoption. We must sustain the action of the trial court unless there is no substantial evidence to support its findings in these respects. *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976); *Adoption of Mike and Russ*, 553 S.W.2d 706 (Mo.App.1977).

Appellant conceded that the last support check he mailed to Patricia was sent in March 1978, approximately 14 months prior to the filing of the adoption petition, and testified that he had the financial ability to make the $100 payments. Appellant failed to visit or communicate with Eric during this period. Appellant testified that the last time he saw Eric was in 1977. Appellant failed to send Eric birthday cards or Christmas cards in 1978; failed to notice Eric's birthday in August 1979, and failed to communicate with Eric in any manner during the one–year period immediately prior to the filing of the petition.

Prior to 1972 appellant was employed as a field service engineer. His employment required "a good deal" of travel, primarily domestic travel within the United States. In 1972 appellant began his employment with Lockheed, which required considerable foreign travel. In the past four years appellant has lived and worked in Saudi Arabia, Bahrain, Puerto Rico and London, England. Appellant returned to the United States in March 1979, and during the nine months preceding trial (which commenced November 2, 1979) appellant resided in Palmdale, California.

Appellant mailed monthly support checks of $100 to Patricia each month after the divorce until 1970–1971, when for a ten–month period payments by mail were returned unclaimed. When that occurred appellant placed the money in a savings account in a California bank, naming himself as trustee for Eric. Once during a period of unemployment appellant withdrew sums from the trust account for his own personal use. In April 1978 appellant opened another trust account for Eric, giving as his reason that he was having difficulty in mailing the payments to Patricia.

Appellant seeks to be excused for his apparent neglect of Eric during the year in question on the ground that he did not know Patricia's address in Missouri; that he did not know where to mail support checks between March 1978 and March 1979; that he was outside the United States during this period; that he first learned of Patricia's Missouri address in June 1979 when he received notice of adoption proceedings; that he then retained counsel, tendered Patricia a check for $1,300 through his attorney, participated in the taking of depositions in Kansas City in October 1979, had a visit with Eric in the law offices of Eric's guardian ad litem, and filed a motion in the California divorce court in October 1979 to change the visitation provisions of the decree (in what respect is not shown).

Appellant's excuse for neglecting Eric during the year in question is not convincing. There is ample evidence that appellant had access to several sources of information through which he either knew or could have ascertained Eric's whereabouts. Return receipts for certified mail, requested by appellant and which upon delivery were signed by Patricia, dated March 17, 1978 and March 29, 1979, were plainly stamped "Kearney, Missouri." Patricia wrote her new Missouri address on the reverse side of several support checks, which were returned to appellant in due course. In January 1978, at Patricia's request, her attorney wrote a letter to appellant at his last known foreign address in San Juan, Puerto Rico, notifying him of Patricia's move to Missouri, giving appellant the address Route 2, Kearney, Clay County, Missouri, 64060. Patricia sent appellant a note to the same effect, addressed to him in Puerto Rico. There were family members from whom appellant could have obtained the address if

he made reasonable efforts to ascertain Eric's whereabouts. Patricia's sister was married to appellant's brother. The sister knew Patricia's Missouri address. She wrote letters to that address. It is reasonable to conclude that from his brother or his sister–in–law appellant could have obtained Patricia's address. Appellant concedes he did not ask either of them for the address, assigning as an unconvincing reason therefor that inquiry would have caused a family rift. Appellant could have contacted Patricia's parents and friends who lived in California, but he did not pursue these avenues of information. Appellant testified that he hired counsel in a fruitless effort to find Eric, but he did not testify that he made the foregoing sources of information available to counsel.

During the portion of the year in question that appellant was in London, England in connection with his employment he is to be excused on the ground of impossibility from personally appearing at Patricia's residence for visitation purposes. This enforced absence, however, did not relieve appellant of the duty and privilege of expressing his interest, concern and love for Eric by letter, by telephone, or by sending him remembrances.

The following evidence bears on the question of appellant's care for his son: Appellant visited Eric between eight and ten times during the last 11 years, and not at all within the last two and a half years. Only one birthday card was introduced in evidence: a picture of a buxom young woman with nothing on but long stockings, frightened when a Jack–in–the–Box jumps at her, with the caption: "Hope your birthday–is full of surprises." The card was signed, "Love–Your Dad Nick," and was sent to a six–year old boy. There is no evidence that appellant ever sent Eric a letter or ever called him on the telephone. There is no evidence that during periods when appellant was in the vicinity he availed himself of his right to visit Eric *twice* weekly. His visits averaged once every ten to sixteen months. Although appellant testified he has a paternal feeling of love and affection for his son there is no substantial evidence of communication of love and affection from appellant to Eric, and only the barest evidence of remembrances sent to the boy through the years. Appellant testified he made a will in 1967 "leaving everything in trust to Eric and the rest to Patricia," and that the will has not been changed. That testimony is to be weighed in the light of the fact that in January 1979 appellant married Margaret McDonald, a widow with two children who, according to their mother, "idolize" appellant and with whom appellant has "a terrific relationship." Important in assessing appellant's feelings for his son is the fact that since his remarriage and the formation of a new family unit appellant has made no move to obtain custody of Eric and to bring him into his own home. Evidently appellant is content to have Patricia bear the responsibility for raising Eric in her home, where appellant may have occasional, rare, short visits with him. Apparently appellant desires to have the boy carry on the family name of Santino; he refused to pay a bill submitted for dental services to Eric on the ground that the bill was for services rendered to "Eric Lambertus."

■ Willful neglect is neglect that is intentional, deliberate, and without just cause or excuse, evincing a settled purpose to forego parental duties for the period of time prescribed by statute, *S. C. H. v. C. W. H.*, 587 S.W.2d 945 (Mo.App.1979). The conduct of the parent "must evidence an intent or mental attitude to forsake the status of a parent, at least for the period of time declared in the statute." *In re Adoption of Rule*, 435 S.W.2d 35 (Mo.App. 1968). In *Adoption of Mike and Russ, supra*, the court declared that "The willfulness of 'neglect' is more of a negative proposition, simply the failure to perform the duty with which the parent is charged by the law and by conscience." 553 S.W.2d l. c. 708.

■ Under these criteria there is substantial evidence to support the finding of willful neglect. While intent or mental attitude necessarily must be inferred from

facts and circumstances, there was sufficient evidence from which the trial court was justified in concluding that from March 29, 1978 to June 7, 1979 appellant purposed to forego his parental duties; forsook his status as a father and failed to perform those duties and functions which he was legally and in good conscience obligated to perform.

Appellant emphasizes his continuing payment of the $100 monthly support through the years. Paying the support money has been appellant's principal activity and chief concern in connection with his relationship with Eric.[1]

■ From appellant's testimony the conclusion is forced that the only reason and purpose behind his desultory efforts to obtain Patricia's address was simply to enable him to forward the support checks. He gave no indication that he wanted Patricia's address in order to communicate with his son. If appellant had timely made every payment he would be entitled to no special credit, because these payments were not voluntarily made. They were made under compulsion of a court order. He was doing only what he had to do. More to the point, more important than sending money, is the matter of communication—communication of love and affection by a parent to a child; the parent's expression of interest in the child and his world; the communicated desire to be in the child's company whenever possible; the development of a commonality of interest and an empathy with him. These are the things that count heavily in a situation where by force of circumstances personal visitation is impossible. These are the measures of proper care and maintenance within the meaning of these terms as used in § 453.040, supra. These are the things notoriously absent. There were no letters, no cards, no gifts, no telephone calls, as well as no support money—nothing but complete silence for more than a year immediately preceding the filing of the petition. The absence of these tokens and indicia of care supports the order below. There was no error in the court's determination that the father's consent to the adoption was not required because of willful neglect for the statutory period.

■ Nor did the court err in deciding that the best interests of the child would be served by terminating appellant's parental rights and decreeing the adoption. There is substantial evidence in support of the court's findings in this respect. There is testimony that Eric for ten years or more has been living in a pleasant, wholesome, stable family environment with his mother and stepfather; that Mr. Lambertus considers Eric to be his first son, and treats Eric no differently than he treats his own son and daughter; that the stepfather engages in many joint activities with Eric such as coaching the son's baseball team, involving himself in the Cub and Boy Scout programs, going camping and backpacking with Eric, helping him with his science fair project, etc.; that Mr. Lambertus understands and willingly accepts his duties and obligations as an adoptive parent and for several years has been hoping to adopt him, and that he is financially able to properly raise the child. Eric enjoys good health, and is growing mentally, morally and spiritually in his present home. He is being raised in a church environment. He is a straight-A student in school and has earned this scholastic record the past four quarters. Eric goes by the name Eric Lambertus by choice. He understands and has given thought to the matter of adoption and would like to be adopted by his stepfather.

A social service worker connected with the Division of Family Services provided the court with a comprehensive adoptive home study which contained findings on the subjects of motivation to adopt, background of petitioners, courtship and marriage, finances, health, religion and social activities, house and surroundings, child being adopt-

1. Even so, appellant is delinquent in his accounts. He owes Patricia $1,000 plus interest for the 1970–71 period, and $1,900 plus interest from March 1978 to trial time. The tender of $1,300 *after* these proceedings were commenced covered less than half the deficiency.

ed and references. The report concluded with a favorable evaluation and recommendation of adoption. Eric's guardian ad litem recommends the granting of the petition.

Considerable negative evidence was introduced in support of the termination of appellant's paternal rights. Patricia testified that during their marriage appellant exhibited a violent temper, manifested emotional problems, was guilty of deviate sexual misconduct, and subjected her to physical assaults, accompanied by threats against her life and that of Eric. Although remote in time these factors are important in assessing the issue before the court, i. e., whether the character of appellant is such that Eric should continue to be exposed to his influences. Appellant's visits upset the boy. Appellant made promises to Eric which he did not keep, thus engendering distrust in him. During all the years appellant sent Eric a gift from a foreign country only once. Eric has the feeling that his father doesn't care because "he doesn't even remember birthdays, or anything." Eric testified that his father is not concerned and is not interested in him.

The trial court saw, heard and observed petitioners, Eric, Nicholas Santino, his present wife, and the other witnesses and had an opportunity to assess their appearance, demeanor, character and sincerity. The court read and considered the social worker's adoptive home study and the recommendations of the guardian ad litem. Deferring to the findings of the trial court declaring "it is in the best interest and welfare of the said minor child to terminate the parental rights of the said natural father," and decreeing the adoption by petitioners, which findings and judgment are based upon substantial and in most instances uncontradicted evidence, the judgment is affirmed.

All concur.