In the Interest of P.G.M., f/k/a Baby Girl S.

S.L., Appellant,

v.

Jasper County Juvenile Office, D.C.M. and T.A.M., Respondents.

No. 26083.

Missouri Court of Appeals, Southern District, Division Two.

Oct. 12, 2004.

Motion for Rehearing or Transfer to Supreme Court Denied Nov. 3, 2004.

Application for Transfer Denied Dec. 21, 2004.

Gary Brotherton, Columbia, for Appellant.

Joseph L. Hensley, Hensley Law Firm, L.L.C., Joplin, for Respondents D.C.M. and T.A.M.

JOHN E. PARRISH, Presiding Judge.

S.L. appeals an adoption judgment that terminated his parental rights to P.G.M.[1] This court affirms.

P.G.M., a girl, was born as a result of a relationship the birth mother (A.S.) had with S.L.[2] A.S. learned she was pregnant

1. S.L. filed two motions that were taken with the case. The first requests this court to stay this appeal and remand the case for hearing concerning representation S.L. received in the trial court. That motion is denied. *See In Interest of F.M.*, 979 S.W.2d 944, 947 (Mo. App.1998). The second requests this court to strike the statement of facts in the respondents' brief. The statement of facts in neither the appellant's brief nor respondents' brief is a model of compliance with Rule 84.04(c) with regard to the direction that statements of fact are to be fair and concise and without argument. The motion to strike the statement of facts in respondents' brief is denied. As in *Higgins v. Missouri State Employees Retirement System*, 760 S.W.2d 449, 451 (Mo.App. 1988), *cert. denied*, 490 U.S. 1047, 109 S.Ct. 1956, 104 L.Ed.2d 425 (1989), the deficiencies about which appellant complains are not so severe that this court would grant the harsh remedy sought by appellant.

2. The parental rights of A.S. were terminated as part of the proceeding that produced this

with P.G.M. in May 2002 during that relationship. The relationship A.S. had with S.L. continued until August 2002, when S.L. was convicted and imprisoned for what A.S. described as "credit card fraud."[3] A.S. and S.L. corresponded for "three months after he was locked up."

During S.L.'s relationship with A.S., both used drugs. A.S. explained the life style they employed, "We were living in hotel, from hotel to hotel. I had figured I was pregnant and got a pregnancy test and I had been using heavy Oxycotin [sic] with him and was getting violently ill from it and had a bad feeling that something was wrong and I must be pregnant. So I took the test and it was positive." She was asked the following questions and gave the following answers:

Q. Did you have a permanent home at the time?

A. Did I have a permanent home?

Q. Uh-huh, at that time?

A. No. He was running the credit card thing, scammin' [sic] the credit cards, and we were going from hotel room to hotel room. We didn't have a permanent place at that time.

Q. Okay. You say he was running a credit card scam. Can you tell the Court what you mean by that?

A. He's incarcerated for that reason right now, credit card fraud. He was obtaining credit card information, Social Security numbers, date of birth from people, using their credit card information over the phone to order rooms, anything we needed by phone, and was able to give us a place to stay at night.

After S.L. went to prison, A.S. was left without support. She stated she was pregnant, sick, and had "walking pneumonia." She told the trial court she "had no utilities"; that she "was freezing to death, it was wintertime."

A.S. testified that immediately after S.L. was incarcerated, she was in a treatment program at a place she identified as Lafayette House; that her decision to place the baby for adoption was made then. She told the trial court that S.L. knew of her plan since September 2002. She said S.L. knew how to contact her; that she had family in the area where she was located and he was aware of them. He also knew she was in Lafayette House and knew how to contact them.

D.C.M. and T.A.M. (petitioners) met A.S. in November 2002. A.S. chose them to be the adoptive parents for her baby. After an initial meeting, petitioners' contacts with A.S. were at doctors' offices for prenatal care and by telephone. A.S. told petitioners that she did not believe she could take care of the child; that "she was an addict and she did not want to put the child through that." A.S. told them that the baby's father was also an addict; that he was incarcerated and would not be able to provide for the child.

Petitioners attended doctors' appointments with A.S. A study of petitioners' home had been prepared before the birth. They were with her during delivery of the child February 4, 2003. Petitioners participated in activities for new parents provided by the hospital. They stayed at the hospital with the baby. Petitioners filed their petition seeking custody and adoption of P.G.M. February 6, 2003. An order was entered permitting them to remove P.G.M.

---

appeal. A.S. consented to termination of her parental rights.

**3.** S.L. stated he was serving "two five-year sentences and a three-year sentence." The record on appeal in this case does not include a copy of S.L.'s record of conviction.

from the hospital.[4]

S.L. was served with summons in the adoption case on February 14, 2003. He filed a *pro se* document denominated "Respondent's Response Pleading" on February 24, 2003. It included statements that he did not consent to transfer of custody or adoption and that he was indigent and requested appointed counsel. On March 10, 2003, counsel was appointed to represent S.L.

The parties appeared before the trial court December 4, 2003. An amended petition was filed that alleged, with respect to S.L., that his consent to adoption was not required for the reason that he abandoned the child without provision for parental support and without making arrangements to visit or communicate with her although able to do so. As with the original petition, petitioners sought termination of parental rights and adoption. The trial court heard evidence and, at the conclusion of the evidence, took the case under advisement.

■■■ The trial court entered judgment December 24, 2003. On January 2, 2004, the trial court filed an Amended Decree of Adoption. The trial court found that S.L. abandoned the child for a period of six months prior to the filing of the amended petition; that S.L. left the child without any provision for parental support and without making arrangements, either prior to or after his incarceration, to visit the child although able to do so. The trial court further found that S.L. made only token efforts at support for the child, made no efforts to communicate with her, and, viewing his conduct as a whole, willfully intended to abandon the child. The petition for adoption was granted.

In an adoption case, as in other court-tried cases, appellate review is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo.banc 1976). Therefore, we must sustain the judgment of the trial court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, or unless it erroneously declares or applies the law. *H.W.S. v. C.T.*, 827 S.W.2d 237, 240 (Mo.App.1992). Deference is given to the trial court's determinations of witness credibility. *In re K.K.J.*, 984 S.W.2d 548, 552 (Mo. App.1999). In determining if substantial evidence exists to support the judgment, we defer to the trial court on factual issues and do not substitute our judgment for that of the trial court. *Id.* "Greater deference is granted to a trial court's determination in custody and adoption proceedings than in other cases." *Id.* "We review the facts and all reasonable inferences therefrom in the light most favorable to the trial court's judgment." *In re C.J.G.*, 75 S.W.3d 794, 797 (Mo.App.2002).

*In re K.N.H.*, 118 S.W.3d 317, 319 (Mo. App.2003).

■ S.L. asserts in Point I that the trial court erred in terminating his parental rights because it was not proven "that [S.L.] abandoned his infant daughter." Point I contends the record on appeal "does *not* contain 'clear, cogent and convincing evidence' that, for a period of at least six months and without good cause,

---

**4.** The order that initially placed the child with petitioners was dated February 6, 2003. It provided:

[Petitioners] are hereby authorized to remove [the child] born February 4, 2003, from Freeman Hospital. Said child is placed in the temporary care and custody of [petitioners] under the temporary supervision of the Juvenile Court. [Petitioners] are authorized to obtain any necessary medical, dental, surgical and hospital care and treatment necessary for said child while in their care and custody, pending further order of the Court.

[S.L.] abandoned [the child] by intentionally leaving her without parental support and without arranging to visit or communicate though able to do so."

Rule 84.04 states requirements for an appellant's brief. One requirement is that points relied on be stated as specified in Rule 84.04(d). The requirements for points on appeal directed to decisions of a trial court are set out in subparagraph (d)(1). It requires the point to (1) identify the trial court ruling being challenged; (2) state concise legal reasons for the claim of error; and (3) explain in summary fashion, in the context of the case, the legal reasons that support the claims of error. Point I complies with requirements (1) and (2); however, it fails to provide the information required by (3), *viz.*, in what manner, in the context of the case, the evidence elicited at trial was deficient.[5]

 An insufficient point on appeal preserves nothing for appellate review. *Tidball v. A.G. Service Center, L.C.*, 75 S.W.3d 850, 853 (Mo.App.2002). However, "[w]hether to dismiss an appeal for deficiencies in an appellant's brief is discretionary." *Keeney v. Missouri Highway and Transp. Com'n.*, 70 S.W.3d 597, 598 n. 1 (Mo.App.2002). "That discretion is generally not exercised unless the deficiency impedes disposition on the merits." *Id.* "A brief impedes disposition on the merits where it is so deficient that it fails to give notice to [the court] and to the other parties as to the issue presented on appeal." *Wilkerson v. Prelutsky*, 943 S.W.2d 643,

647 (Mo. banc 1997). Because of the nature of the case, this court, to the extent it can glean what is asserted from the argument portion of the brief, will consider the issue to which Point I alludes on the merits.

S.L.'s appellant's brief is anything but concise. The first part of the argument directed to Point I complains of the lack of allegations in the initial petition regarding grounds to terminate S.L.'s parental rights. However, that is not the petition on which the trial court adjudicated S.L.'s parental status. The petition on which the trial court entered judgment with respect to S.L. was filed December 4, 2003. The trial court declared that the amended petition "created a cause of action against [S.L.]"; that "the amended pleading contemplated the acts of [S.L.] from the date of the birth of the child to the time of trial, and specifically the six months prior to December 4, 2002." [6]

The judgment that is appealed includes the finding that "the allegations of the Amended Petition for Adoption are true and that the rights of the biological father should be terminated." The findings note that S.L. had been incarcerated since August 19, 2002. They continue:

Despite his incarceration, the biological father was aware the mother of the child was pregnant the same month he went to prison in August of 2002, approximately six (6) months before the birth date of the child. He did nothing at that time to secure housing or make

---

**5.** This court notes that S.L.'s appellant's brief has assigned argumentative and conclusory titles to each point relied on. That practice is not consistent with Rule 84.04 and should not be followed. The titles assigned to S.L.'s points relied on are stricken.

**6.** The amended petition alleged that S.L. was the natural father of the child. It includes the allegation, "Pursuant to Section 211.447.4(1)

RSMo.1998, the consent of the natural father is not required and grounds exist for the termination of parental rights because the natural father has abandoned the child for a period in excess of six months, without good cause, by leaving the child without any provision for parental support and without making arrangements to visit or communicate with the child, although able to do so."

financial arrangements for the child. The record reflects that prior to the child's birth, the biological father did talk to a worker at the Lafayette House and a Division of Social Services worker apparently in an effort to gather information about the mother or the child's birth. No requests were made by the natural father for visitation or to provide any form of support for the child. No requests were made to assist in the pregnancy, prenatal care, or to assert his paternity. Further, no attempts were made at all *after* the child was born. The biological father did not register with the Putative Father Registry as allowed by § 192.016 or otherwise acknowledge his paternity.[7]

There was no attempt at contact through letters or gifts after the child was born. The biological father admitted as much at trial, though stated he was handicapped by his incarceration and lack of assistance. There were no inquires as to the child's well-being.

In terms of monetary support, the biological father contributed a total of $20.00 support to the child in the 10 months subsequent to the birth of the child. These payments were made in two installments of two $5.00 payments. There was some mention at trial that a Jewish agency may have contributed $100.00 for support of the minor child, apparently *on behalf of* the biological father, but the $100.00 was apparently returned and never received by the Petitioners, the Court or the State.

The trial court further found that S.L. testified that he would not be an appropriate caregiver when he got out of prison;

that he would not be capable of taking care of a child at that time. It concluded that S.L. knew about the mother's pregnancy "for approximately six months prior to the birth"; that "[o]ther than filing a pro se pleading and sending two Five Dollar ($5.00) support checks on two occasions, he has not contributed to this child's care." It found the contributions to be token attempts at support, noting that "[i]n determining whether a parent has abandoned [a] child, for the purpose of termination of parental rights, a court may disregard contacts that it finds to be token or nominal." The trial court held that S.L.'s efforts to maintain a relationship with the child and support had been "token, at best." It found that that the father's conduct demonstrated that he "willfully intended to abandon the minor child" and entered judgment terminating parental rights of S.L. and granting adoption to petitioners.

■ S.L.'s Point I, as this court understands from the argument directed to it, challenges the sufficiency of the evidence on which the trial court determined that S.L. willfully abandoned the child. *See* § 211.447.2(2)(b).[8] *See also* § 453.040(7).

Section 453.040 provides:

The consent to the adoption of a child is not required of:

. . .

(7) A parent who has for a period of at least six months, for a child one year of age or older, or at least sixty days, for a child under one year of age, immediately prior to the filing of the petition for adoption, willfully abandoned the child or, for a period of at least six

---

7. § 192.016.1, RSMo 2000, provides for a "putative father registry" that includes names and addresses of "[a]ny person who has filed with the registry before or after the birth of a child out of wedlock, a notice of intent to

claim paternity of the child; . . . ." § 192.016.1(2).

8. References to statutes are to RSMo 2000 unless stated otherwise.

months immediately prior to the filing of the petition for adoption, willfully, substantially and continuously neglected to provide him with necessary care and protection;....

Sections 211.447.2(2)(b) and 211.447.4(1)(b) prescribe the same criterion for determining abandonment as § 453.040(7).

*In re Watson's Adoption*, 238 Mo.App. 1104, 195 S.W.2d 331, 336 (1946), established the definition for willful abandonment as either "a voluntary and intentional relinquishment of the custody of the child to another, with the intent to never again claim the rights of a parent or perform the duties of a parent; or ... an intentional withholding from the child, without just cause or excuse, by the parent, of his presence, his care, his love, and his protection, maintenance, and the opportunity for the display of filial affection." That continues to be the definition to which Missouri courts adhere. *See In re C.J.G.*, 75 S.W.3d 794, 797 (Mo.App.2002); *In re R.K.*, 982 S.W.2d 803, 806 (Mo.App.1998); *C.B.L. v. K.E.L.*, 937 S.W.2d 734, 737 (Mo. App.1996); *In the Interest of W.F.J.*, 648 S.W.2d 210, 215 (Mo.App.1983); *In re E.C.N.*, 517 S.W.2d 709, 715 (Mo.App. 1974).

▇▇▇ Each adoption case is judged on its own unique set of facts. *In re A.B.M.*, 17 S.W.3d 912, 916 (Mo.App.2000). In this case, S.L. never had custody of P.G.M. Thus, the question for determination is whether S.L. intentionally withheld care, love, protection, and his presence from P.G.M., thereby abandoning her. *In re*

*Adoption of H.M.C.*, 11 S.W.3d 81, 87 (Mo. App.2000).

▇▇▇ Abandonment is largely an issue of intent of a parent, inferred from his or her conduct. *In re N.R.W.*, 112 S.W.3d 465, 469 (Mo.App.2003). Evidence of a parent's conduct, both before and after the statutory period for abandonment, may be considered. *In re J.M.S.*, 83 S.W.3d 76, 82 (Mo.App.2002).

The trial court found that S.L. was aware A.S. was pregnant with P.G.M. prior to his August 2002 incarceration; that he made no effort to assist A.S. during her pregnancy with housing or financial arrangements in anticipation of the child's birth. S.L. did not contact A.S. or her family members regarding the pending birth. He did not file a claim of intent to claim paternity with the putative father registry as permitted by § 192.016.1(2).[9] S.L. learned that P.G.M. had been born February 4, 2003, when served with a petition for her adoption February 14, 2003. Between that date and December 4, 2003, when the amended petition was filed alleging abandonment by S.L., S.L. expressed opposition to a transfer of custody of the child or her adoption.

▇▇▇ The trial court found, however, that S.L. made no inquiries about the child's well-being; that he provided no gifts nor requested visits with the child.[10] The trial court found S.L. sent two payments for the child's support of $10.00 each. The trial court found S.L.'s efforts to maintain a relationship and provide sup-

---

**9.** § 192.016 was amended by CCS SS SCS HS HCS HB 1453, Laws of Missouri, 2004, to provide that failure to register as a putative father waives, under certain circumstances, a man's right to withhold consent to adoption. That provision of the law was not in effect at the time of the proceedings in this case.

**10.** S.L. contends his incarceration precluded visitation; that had a request been made it would have been denied. This argument is speculative in that no request was made. Furthermore, a request would have demonstrated S.L.'s desire and intent to establish and maintain a parent-child relationship. *In Interest of M.L.K.*, 804 S.W.2d 398, 402 (Mo. App.1991).

port was "token, at best." "Parents are not allowed to maintain only a superficial or tenuous relationship with their children in order to avoid a determination of abandonment. *[In Interest of] M.L.K.,* 804 S.W.2d [398] at 403 [ (Mo.App.1991) ]. Courts may regard such efforts as token and terminate parental rights despite their existence. *Id.*" *In Interest of M.N.M.,* 906 S.W.2d 876, 879 (Mo.App.1995).

 S.L. also told the trial court he would have been willing to surrender his rights to the child if his sister were given custody. A willingness to voluntarily relinquish parental rights if a relative would receive custody demonstrates a desire contrary to the maintenance of a parental relationship. *In Interest of A.R.M.,* 750 S.W.2d 86, 90 (Mo.App.1988). The trial court's determination that S.L.'s actions relative to the child during the six months prior to the filing of the amended petition were token and, considered with the willingness of S.L. to relinquish parental rights if he could choose the new parent, manifested an intent to abandon her is supported by competent, substantial evidence and not contrary to the overwhelming weight of the evidence. As in *A.R.M.,* "[b]y word and by deed" S.L. demonstrated the intentional abandonment of P.G.M. The evidence was sufficient for the trial court to have found that S.L. intentionally withheld from her, without just cause, the care, love, protection and presence of a parent; that he willfully abandoned P.G.M. Point I is denied.

Point II asserts that "[t]he trial court erred in assuming jurisdiction and transferring custody to [petitioners] 'for purposes of adoption.'" Although Point II does not substantially follow the form directed by Rule 84.04(d)(1), this court perceives the claim of error to be based on the fact that the original petition filed in this case did not allege facts that would consti-

tute any exception prescribed by § 453.040 as a basis for foregoing a parent's consent to an adoption. Point II will be addressed on its merits in that its failing will not impede disposition of the issue this court perceives as being raised. *Wilkerson,* 943 S.W.2d at 647.

 S.L. argues that the trial court lacked jurisdiction because it contained no specific averment that, if true, would allow a court to terminate his parental rights. As stated previously, the case was tried on the amended petition that was filed December 4, 2003. It alleged abandonment by S.L. as discussed with respect to Point I. S.L. nevertheless complains about the order originally entered that placed P.G.M. with petitioners. As this court understands his argument, he contends that because the original petition did not allege an exception to the requirement for his consent to the adoption, the trial court had no authority to place P.G.M. in petitioners' custody and, therefore, the adoption that was ultimately granted fails. That is incorrect.

In order for a petition for adoption to enable a trial court to exercise its jurisdiction, the petition must allege facts as denominated by § 453.020. *Adoption of Mike and Russ,* 553 S.W.2d 706, 709 (Mo.App. 1977). Section 453.020 provides:

> The petition for adoption shall state:
>
> (1) The name, sex and place of birth of the person sought to be adopted;
>
> (2) The name of his parents, if known to the petitioner;
>
> (3) If the person sought to be adopted is a minor, the fact that petitioner has the ability to properly care for, maintain and educate such person; and
>
> (4) If it is desired to change the name of such person, the new name.

The original petition (as well as the amended petition) met those requirements. Consent to adoption, or an exception thereto, must be pled and proven before a

court may grant an adoption; however, "inclusion of the statutory provision in the petition [is] not a prerequisite to the court's jurisdiction." *Adoption of Mike and Russ, supra.* Point II is denied.

■ Point III is directed to action taken by S.L.'s sister, B.L. Eight months after P.G.M.'s birth, B.L. moved to intervene in petitioners' action for adoption. The trial court denied the motion. B.L. then filed a motion that requested the case be consolidated with another action for adoption she had filed. B.L.'s motion to consolidate the adoption cases was filed October 21, 2003. On October 28, the trial court scheduled a hearing on the motion for November 18, 2003. A November 18, 2003, docket entry recites that a hearing was held that date and the motion to consolidate was denied.

Point III argues that the trial court abused its discretion in refusing to let B.L. intervene in this action "or to consolidate her separate petition." As with respect to Points I and II, Point III does not meet requirements of Rule 84.04(d)(1). Other than the allegation of error, its narrative asserts the trial court chose to ignore B.L.'s "comparative fitness" to have custody of the child. The deficiencies of Point III are of a magnitude that they impede this court's ability to address the claimed error on the merits. The court has nevertheless, *ex gratia,* reviewed the actions of the trial court about which Point III complains for plain error and finds none.

B.L. is not a party to this appeal. She is the party who would be aggrieved by the trial court's rulings. Only a party aggrieved by the actions of the trial court may appeal and raise a claim of error. § 512.020; *L.J.B. v. L.W.B.,* 921 S.W.2d 23, 27–28 (Mo.App.1996). S.L. lacks standing to appeal that issue. Point III is denied.

■ S.L.'s Point IV complains about the assistance he received from the attorney who represented him in the trial court. S.L. is represented by a different attorney in this appeal. Point IV argues that the trial court erred in terminating the parental rights of S.L. because S.L.'s trial attorney "rendered ineffective assistance of counsel." S.L. complains that his trial attorney failed to corroborate aspects of his testimony and failed to take steps that S.L. suggests should have been taken during the course of the proceedings in the trial court. He argues that what he deems to have been deficient performance by his attorney denied him "a meaningful hearing based on the record."

S.L.'s trial attorney was present at each stage of the proceedings. He presented evidence on behalf of S.L. and extensively cross-examined each of petitioners' witnesses. *See In re S.T.W.,* 39 S.W.3d 517, 520–21 (Mo.App.2000); *In Interest of F.N.M.,* 951 S.W.2d 702, 707–08 (Mo.App. 1997). Additionally, S.L.'s trial attorney encouraged S.L. to contribute financially to the support of P.G.M. He testified on S.L.'s behalf regarding financial support S.L. had contributed for P.G.M. He introduced certification regarding a parenting course S.L. attended while incarcerated. He introduced letters written by S.L. to refute testimony by A.S. detrimental to S.L. The record before this court demonstrates that S.L. received a meaningful hearing. Point IV is denied. The judgment is affirmed.

SHRUM and BARNEY, JJ., concur.

### ON MOTION FOR REHEARING, OR, ALTERNATIVELY, APPLICATION FOR TRANSFER

PER CURIAM.

S.L. states in his motion for rehearing that this court misstated material matters of fact in its opinion; that the statement that S.L. did not file a notice of intent to

claim paternity with the putative father registry was incorrect. S.L. attached a form of the Missouri Department of Health and Senior Services that bears a "[d]ate [s]igned" of "7–31–03" that purports to be his registration of the intent to claim paternity of the child who was born February 4, 2003.

This court's review of the record discloses that a copy of the form was filed with this court as an attachment to a motion that sought to stay this appeal. The record, however, does not reveal that the document was before the trial court. Accordingly, it was not a part of the legal file component of the record on appeal. Its inclusion with the motion to stay the appeal filed in this court was directed to a request to stay the appeal and remand for a hearing regarding the sufficiency of the representation S.L. received in that court. This court denied that motion.

Regardless, as the opinion states, the provision of law enacted in 2004 that provides failure to register as a putative father waives, under certain circumstances, a man's right to withhold consent to adoption was not in effect at the time of the proceedings in this case. As the opinion recites, S.L. expressed opposition to the transfer of custody and adoption of the child from shortly after the date he was served with a petition for her adoption on February 14, 2003. The misstatement about which S.L. complains had no bearing on the outcome of the case. It is not, as S.L. suggests, "material" regarding the disposition of the case. The other issues asserted in S.L.'s motion for rehearing were previously considered. The motion for rehearing is denied. S.L.'s alternative application for transfer to the Missouri Supreme Court is denied.